Good morning, your honor. May it please the court. I'm Daniel Kaplan. I represent the appellant Darren Quesada. I'm going to watch the clock and try to save about three minutes of my time for rebuttal. Fine. This trial was about my client, Darren Quesada, but this appeal is just as much about a person we only know as juror number 46. Juror 46 was a former U.S. Marine corporal. He was a veteran of combat in Desert Storm. He was a federal government employee of the Bureau of Indian Affairs, a teacher. He was married and had three children, one of whom, in this case involving allegations of sexual abuse of young children, was three years old. And he was a Native American. Now, he, of course, did not actually serve on Mr. Quesada's jury because he was thrown off by a preemptory strike exercised by the government. When the Batson challenge was raised, the government offered three justifications for having thrown juror 46 off of the jury. Number one, he said — she said, well, he said he had a relative who had a DUI charge, served some time, maybe he's biased against the government. Number two, she said he said he had acquaintances in the White Mountain Apache tribe, which was the tribe in which these alleged events underlying the trial happened. And she also threw in a statement that she had trouble understanding what he said. Batson requires a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. Roberts. I'm going to ask you a question. Go ahead. Can you explain to me, and I don't know that it's in the record, is to the type of procedure that took place during Vordir here. Some judges do it all. Some judges let lawyers do a lot. And as all the trial lawyers know, that latter is probably more the case. And then there are some judges who do both. What happened here, and was there opportunity for follow-up questioning? In other words, the procedure by which it was done. The procedure for Vordir and specifically for a Batson challenge and the ability for someone to question or additionally question a juror. What happened was that the court, the judge, asked a set of questions, a large number of questions, many of which went to potential bias. Do you know any of these witnesses? I read the names. I spelled the names. Do you have close friends in the White Mountain Apache tribe? And at various points during the process, if either counsel wanted to ask follow-up questions, they did do that. In fact, the trial lawyer for Mr. Quesada asked questions of individual jury applicant or venerey persons at three different places in the record, page 150, page 155, page 168. He asked follow-up questions. And the prosecutor herself asked a follow-up question of a juror at one point on page 157. So very limited follow-up for the lawyer's choice? The lawyers had free reign to ask follow-up. There were no restrictions. So I've enumerated the places where lawyers opted to ask follow-up questions along the way as the questions were being given. At the end of all of that, the judge said, okay, I've asked everything I wanted to ask, do the lawyers have any more follow-up? And at that point, both of the counsels said we don't. But I do want to note that there was questioning along the way by both counsel.  You're welcome. Now, looking at that available evidence to assess these proffered rationales, what we find is that under well-established precedent, none of those can hold water. The first was he said he had a relative who had a DOI charge who served some time. Maybe he's biased against the government. Maybe this former U.S. Marine Corporal Federal Government employee is biased against the government. Well, compare 46 to No. 12. The little tone of sarcasm in your voice. Yes, Your Honor. I wanted to make sure. And it's meant with respect, but also with the intended meaning, which is it doesn't hold water. It's deserving of that, because if you look at Juror No. 12, a non-Indian, Juror No. 12 had two children. Her – both of her two children were drug felons. One of them served six months and one of them served a full year. Now, a person who was wary of having people whose relatives had served time on criminal charges would not have allowed Juror No. 12 to sit on the jury floor. And or would have found out what relative Juror 46 was talking about. Exactly right. And what a bit of time was. Exactly right. More information should have been elicited. Exactly right. Miller L. and Ali case, Judge Prezan recently wrote, many more cases, the point is, if something was a true issue of concern that really motivated a strike and brought the prosecutor to the point of actually exercising a strike, there would have been some questioning about it. And we've gone over the procedure. There was full opportunity to ask questions, and follow-up questions were asked without any restriction by the judge. Does the record reflect any reasonable alternative for keeping Juror 46 off and striking No. 12 other than race? No. The government obviously will dispute that, and the government disputed that in the brief. But all I saw in the brief was, well, she was different. She was a woman. She was an alternate on a jury before. Well, of course there are differences. In the Miller L. case, the Supreme Court said, of course there's differences. People, jurors, are not a set of the product of a set of cookie cutters. They're never going to match up like gingerbread cookies on a baking tray. So that really is not a significant or a reason that can explain that difference between the striking practice on those two. Now, when you get to the point of saying we can't find any justification that holds water for that first reason that was given, already you know it's going to be very hard for the government to justify that strike and survive that Batson challenge, because ever since Chinchilla, which was just three years after Batson, many, many cases in this Court and the Snyder case in the Supreme Court more recently has said when there's one bogus reason that's given and you go to the other reasons, it's very hard to look to give much credibility to the other reasons. So with that in mind, the second reason was the prosecutor said, well, he did mention he had some acquaintances who were White River tribal Indians, in other words, members of that reservation. Well, the fact is the judge told all the assembled potential jurors, including 486, when I say do you know something or does anybody know any of his witnesses, and I ask all of you en masse a question, and you don't raise your hand, that's a no under oath. Now, 486 came up later in the process, and the judge asked him would any of the answers to any of my prior questions have been yes. And 486 said yes as to two of them. He didn't say yes as to do you know any of the witnesses in this case. He didn't say yes as to any of the other questions indicating possible relationship to people involved in the case. Or do you? Kagan. But the other problem here is that the explanation for why she didn't believe him was essentially I don't believe these people or something, essentially. Your Honor, I think the prosecutor came very close to the line and very possibly stepped over the line of saying I've had problems in the past involving people on reservations, and that's almost to the step of saying I've had problems trusting Native Americans. I mean, it was very close. And I think that arguably that even would have raised a problem at step two of the Batson analysis, but for present purposes we're challenging step three. And the fact that a reason given actually points to bias puts you into the category of the Kessler on bank decision, which also involved Native Americans, where the Court said, you know, obviously that creates the inference of prejudice, and that mandates a reversal of the strike as opposed to justifying the strike and showing it's not racially motivated. So the point I was making is that Juror 46 effectively said my answer to those other questions that I'm not mentioning is no, and I'm saying that under oath. Now, there is no legitimate reason in this record to come to the conclusion that this ex-Marine was lying under oath when he didn't respond and say something about those other questions, nothing. Turning to the final thing the prosecutor said, she mentioned something about having a hard time understanding him. Now, it's not clear she was even suggesting this was one of the reasons for striking. She said, well, the two main reasons are the other things, but I had a hard time understanding him. Now, when prosecutors make an allegation about the manner in which a prospective juror speaks, this Court looks to the transcript to see whether it has any support. Well, the transcript refutes it in this case. In this case, the transcript shows the court reporter did not appear to have any problem understanding Juror 46. The prosecutor herself accurately paraphrased the things Juror 46 had said during the general questioning. So she apparently seemed to understand him well enough to do that. The judge also seemed to understand Juror 46, had some colloquies with him, responded to his questions. At one point, misstated an answer and the Juror 46 corrected him. I would note that there are several places in the record where the judge failed to hear things and had to have things repeated, and there's one place in the record where the judge said, you know, the acoustics in this old courthouse are not that great. So the final thing. So it could have been soft spoken. We just don't know that throwaway line, what it means. We don't know what it means. And as you point out, the transcript reflects no difficulty. So answer me this. If you win on the Batson challenge, do we need to rule on the evidentiary issues? No, because a new trial is mandated under Batson and progeny. But what if these evidentiary issues reappear in the new trial? Should we not rule on those now and avoid them coming back up or not? That's a good point, Your Honor. I think the panel would have the discretion to say, in light of the fact it's going to be a retrial and there's a high possibility that these evidentiary issues will So I believe the panel can do that. And if that's true, then I do have one question on an evidentiary issue. And this follows. Why isn't MC's statement to Nurse Chintus that Quesada touched her when she went to Nurse Chintus complaining of pelvic pain in response to the question whether, quote, anyone had touched her, end quote, in her pelvic region, why was not a diagnosis or treatment and therefore appropriate? Your Honor, I would compare the examination of Nurse Chintus to the examination of Dr. Brown. And when Dr. Brown was on the stand, the prosecutor asked her, can you tell us whether getting the identity of the person who might have abused your patient is relevant to your treatment decisions? And Dr. Brown answered the question and said, yes, that is important, it's important, I need to know that they're safe in their home environment, et cetera, et cetera. That question was never asked to Nurse Chintus. So effectively, what's been recognized as an appropriate basis to lay a foundation for 803.4 wasn't made here. Can't you have that exception applied without that specific question? If you look at the totality of the record, the evidence that had been deduced so far, et cetera, does that specific question need to be asked? And if the answer is yes, can you cite you a case that supports that? Well, what I can say, well, I don't have a case that says without that question you're doomed. I believe it's appropriate to look to the other circumstances. I would say, however, that that question was deemed important in the Lukashev decision. It was relevant in that case. And I would note that the case law seems to find that to be significant, and the Guam v. Ignacio case, the emphasis was on it has to actually be for medical treatment when the statement is made. And that is one way, maybe not the only way, but one way to show the statement was actually necessary for medical treatment. In any event, there were two other statements introduced on a different ground. Do you want to comment on that? Maybe just briefly, Your Honor. There were statements under 801d-1b. The essential problem with the 801d-1b, supposedly to refute improper recent motive fabrication, is my colleague, the trial lawyer, simply didn't argue recent fabrication or improper motive. He certainly could have. It would have been something rational to do. But he said, I'm just, my theory is kids just tell stories. These are, this is like Santa Claus. It's truth to them. It's not that they're lying because somebody told them to recently or something like that. And, of course, the final issue is the impeachment, the impeachment issue under M.C.'s testimony. And it's not a question of mere foundation, as the government argues. It really was establishing a key allegation, and that's why we don't think that response is accurate. I would like to say that's the balance of my time. Thank you. I have, if I may, one question on that point. What is your support when you assert that, quote, the record demonstrates that the prosecutor was aware before calling M.C. to the stand that there was a good chance you would not give the Hope IV testimony? There was a lot of discussion outside the presence of the jury. Is it in the record? In the record, yes. Okay. Where the prosecutor said, I want to call this expert, this forensic interviewer before the children, because I'm not sure what the children are going to do. I'm not sure how they're going to testify. I think Monsher should sort of lay the foundation for assessing child children's testimony. So that's one of the places where that awareness seemed to come up. Anywhere else? That's a little shy of what you say, that he knew there was a good chance you would not give. I don't go to the extent of saying she knew. And I don't think you never literally know. But I think she had good reason to believe, which is the standard under Crouch. Okay. Thank you very much. Ms. Sampson. Good morning, Your Honors. May it please the Court. My name is Demetra Sampson. I represent the United States. I want to get directly to some of the points that Mr. Kaplan brought up during his argument. First of all, for clarification on the Batson challenge, there were actually two stated reasons at trial for the peremptory strike of Juror 46. And I just want to clarify for the record, and I actually stated it on the record at the trial court level, that the fact that I had difficulty understanding Juror 46 was really just a statement to the Court of these are the reasons that I heard and I understood. But I specifically said to the Court, these are my two main reasons for striking Juror 46. So I wanted to be clear that the fact that I had some difficulty understanding him either due to acoustics or the fact that he had a muffled voice was more to the fact of what I could understand he said that I set forth to the Court in my reasons. Also, to answer the Court's question, there was opportunity for brief follow-up, just to be clear, not new questions, but follow-up on questions that had already been answered. I also wanted to clarify something in the record. Mr. Kaplan cited to ER 1, page 157, indicating that I had asked follow-up questions I said, all I said was I couldn't hear the answer. That's not a follow-up question. Kagan But it doesn't matter. You could have, right? Absolutely, I could have. I just wanted to clear up the record. I did not ask any follow-up questions during the entire jury selection process. I could have, but I didn't. And the reason that I bring that up is the case law is pretty clear that where the follow-up questions become an issue is when the prosecutor is asking questions of some jurors and not others or asking questions in different ways. For instance, in the Miller L case that the defense cites in their brief, there were clear patterns of discrimination and the way the prosecutor was asking questions. The prosecutor would ask certain questions of minority jurors and not ask those questions of non-minority jurors or ask them in a different way to elicit a response that would then lead them to justify their strike. So I think it's clear that the focus is on whether the prosecutor is treating the jurors differently, and that didn't happen here. I didn't ask follow-up questions of anyone. I certainly could have. I didn't. I was concerned with the two reasons that Juror 46, that I stated on the record for striking Juror 46. It wasn't just the fact that he had a family member who had been convicted of a crime. I would also point out that you did say that and it was extremely vague testimony and one would have thought that if you were actually going to rely on it at all, you would want to know who and what. That's true. It's always going to be a concern, Your Honor, for the government when somebody has a family member who has been convicted of a crime. It's going to be a concern. And it's one of the concerns that I had in striking Juror 46. It's one of the many things. It was a DUI. Correct. It was an unspecified relative. It could have been a cousin for all you knew. He seemed to be a very forthcoming guy, so he seemed to have been sort of racking his brains for any response, accurate answer. It seems a little far-fetched. Quite aside from the comparative. It was one of the reasons. It was one of the reasons. Had that reason sat alone, I may not have struck him. I was more concerned with the fact that he knew people from the reservation. And I want to be clear. But he didn't know any of the witnesses. He didn't say that he knew any of the witnesses. And I want to be clear. You seem to be questioning his truthfulness. That was what was disturbing. Well, and I noticed that Mr. Kaplan stated in his brief that this was a question of whether I believed him or not. This isn't a matter of whether I believed him or not. And this is a matter of whether I believed him or not. Well, it seemed to be a question of whether you believed him. I mean, because go ahead. Well, and I understand the question. But when you're in the trial setting and somebody gets up on the stand and you're in a small community where people sometimes go by nicknames or other names and their full names are read for the record, and then they take the stand and somebody suddenly — He was not in that community. He didn't live there. He didn't work there. Well, and that wasn't — He had been there, and he knew a few people. And that wasn't entirely clear from the record whether he lived there or not. When he started to talk about being at Holly Lake, which is a location on the reservation, on the Fort Apache Indian Reservation, and said, I know a lot of White River Indians, they're actually — He didn't say a lot. He said some, as I understand it. You're correct. He said, I know some White River Indians, and then he said, but not a lot. Let me clarify that. I apologize. Right after that, he said, I spent the last year there. So his — and then he said, went on to say, but I live in Tonelaya now. So he was a little confused, and that's why I used the word evasive when I argued at the trial court level, because he was a little confused as to the history he was giving. But he said that he had spent some time there and that he knew some people from the reservation. Also — Can I interrupt you, and I apologize? Yes. I'll not take long. I'd like to cut to the chase and have you give the answer to this question. Does the record reflect any reasonable alternative for keeping Juror 46 and striking Juror 12 other than race? And if so, what is that reason for keeping 46 and striking 12? Do you mean the opposite? Sorry. Okay. Striking — yeah. Absolutely. If you're looking at solely a comparative analysis on Juror 46 and Juror 12 and not taking into consideration — well, I think you have to take into consideration the totality. Juror 46 had no new people from the reservation. Juror 12 didn't have that same reason. Juror 12 had served on a jury before. She happened to be selected as the alternate. But knowing people on the reservation itself, a racially connected issue? No, it's not. And in fact, I know that this goes outside of the record, but since it was brought up for the first time today when Mr. Kaplan said that this is a statement about I apologize. A white juror who happened to come in contact with the reservation. You are essentially saying that anybody who lives on that reservation can't be a juror. I'm not. I'm saying it's a totality of the circumstances. Well, the other circumstance doesn't hold up with regard to the comparison. So if you don't have this one, you're a real problem. Understood. But I guess what I'm saying is I don't think that there's any hard and fast rule whether someone on the reservation can or cannot serve. But that seemed to be what you're saying now. But what you seem to be saying at the time is that anybody who knows people on that reservation, I don't want in this jury. Well, and that's true. And that is a real legitimate concern as the trial lawyer in this case, particularly based on my prior experience. That's a major chunk of the Native Americans who are likely to be available as jurors. I'm sorry. I didn't know. Isn't it a major chunk of the Native Americans who are likely to be available as jurors? Well, no. There are Native Americans from a number of different areas from the State that could be jurors. But for somebody who lives in that community, White River, which is a very small community, and I would point out, Your Honor, the name of the case is escaping me, but a case that the defense cited in his reply actually pointed out a Seventh Strike, a peremptory strike based on the location of where a juror resided because it was near where a government witness resided, was a nonracial, neutral reason. And I think it's important, again, to note that the district court judge in this case who had first-hand observations of the credibility and the entire veneer and jury selection process found specifically on the record twice that these were race-neutral, legitimate and nondiscriminatory reasons. And I would urge this Court, as the case law suggests, to give great deference to those decisions. So are you explaining the similarity between 46 and 12, that similarity being a family member of some connection who was previously convicted of a crime, but in this case the juror who you struck, in addition, was familiar with the community, even though the record doesn't disclose or, in fact, discloses arguably the opposite, he didn't know any of these parties. There were witnesses involved. Is that what you're saying? Is that clear? I believe your question is clear. What I'm saying is that looking at the totality, I only have so many strikes I can exercise. Sometimes it comes down to I actually made a couple of motions to strike for cause at the time. The district court denied them. So I had to use some of those for my peremptory strikes. I'm going to get seven. And I have to make choices. And I want to try to have a fair and impartial juror. And my question is, why did you make the choice of this juror over the other similar juror? Because Juror 46 had the two reasons. And, again, I didn't even know he was Native American. I think I stated that on the record, that I didn't know until we were done with strikes and my agent brought it to my attention. I still don't withdraw that. I still think that my reasons were legitimate. But just to be clear, there was no underlying racial motive. Juror 46 knew people from the community. It's a very small community. He also said I know a few White River tribal Indians. And he actually said I've been at the Holly Lake, but I live, work and reside in Tonell, Olea, Arizona. Right. But right after his statement, Your Honor, in the transcript where he says that he had been to Holly or that he had been to Holly Lake, that he knew White River Indians, and then he said I spent the last year there. He didn't say that. You see, you keep doing that. He didn't say that. He said I've been up there for the last year. Right. I take it to mean, you know, once in a while in the last year, but next sentence, but I live and work and reside in Tonell, Olea, Arizona, completely different place on the Navajo Reservation. At the time when he said, but I've been there for the last or I've been up there for the last year, I took it to mean that he spent either a significant amount of time there or that he lived there and he knew people from the community. And again, with all due respect, I think the case law is clear that these, the reasons for my strikes don't have to rise to the level of a motion to strike for cause. They don't necessarily even have to be legitimate. I don't have to show that this juror was necessarily prejudiced to the government or biased to the government. What the question is here is whether or not the reasons for the strikes were racially motivated. And I think the record is clear that they were not. I'd also just like to point out that the cases that Mr. Kaplan cites, like Chinchilla and some of the other cases, talking about kind of this bleed-over effect where if one reason or several reasons given are found to be pretextual, then that necessarily means that it undermines the credibility of the remaining strikes. I think I would just be clear that those cases are largely distinguished from the case at Barr. And that's because in those cases, you had prosecutors stating on the record reasons for striking the juror that were completely contradicted by the record. They were complete misstatements of what the jurors had said and completely contrary to the record. And there were, in those cases, typically numerous reasons stated by the prosecutor, many of which, like 2 out of 4 or 4 out of 6 in many of the cases cited by Mr. Kaplan, that were found to be pretextual, which, again, the Court said is only one consideration or one factor for this Court in reviewing the totality of the circumstances. It's not necessarily determinative of the issue. Again, and if there's no more questions on this point, I would like to move up on to the prior statements, because I believe my time is almost up. I would, though, ask that the Court give deference to the district court's finding on the Batson challenge. I want to move to Rule 803-4, the statements that were admitted to Nurse Candy Shintas by victim MC. And again, the Ninth Circuit case law is clear that the identity of the perpetrator, particularly in child sexual abuse cases, is relevant. And to answer directly this Court's question, I think the answer is no. The question does not necessarily have to be asked of the witness. I do think in this case that Dr. Brown laid that foundation for the testimony, even though she was not the testifying witness at that moment. The defense didn't object when Dr. Brown testified and she testified to the identity of the perpetrator as it related to the first victim, C.N. It's also important to note that Dr. Scherzer, who talked about the prior act victim, also talked about the identity of the perpetrator. And although there was a general objection to her testimony, it wasn't specific to the identity of the perpetrator. Ms. Shintas clearly thought it was important to find out who the perpetrator was and whether or not he lived in the home, because she asked victim MC, does he still live in the home? So that did come out, but I don't believe that that foundation necessarily needs to be laid through every single witness. It was laid through Dr. Brown in this case. Again, you do have to look at the totality of the circumstances and the indicia of the reliability. I don't believe that the district court abused its discretion in allowing this statement through Kandi Shintas. And as I stated in my response brief, even if there was error, which we do not believe there was, it would be harmless, because those statements did come in through other witnesses, including Carly Monsher, which actually brings to the next point, unless there's any questions on the medical diagnosis. Under Rule 801d1b, prior consistent statements are admissible for in response to an express or implied charge of recent fabrication. We're obviously relying on the implied charge of recent fabrication. Sotomayor, who was charging? Sotomayor, who was charging a recent fabrication? Defense counsel, and that was during cross-examination. And this rule is really a rule of fairness, equity, and completeness. And I think what we ---- But wasn't the recent fabrication running in the other direction? Running in the other direction? I.e., they said they made less incriminating statements at trial than they did in the prior statements. Well ---- So it's unlikely that the defense lawyer was charging recent fabrication. I think we have to look at the two victims separately, because the cross-examination was slightly different. M.C. on the stand, the second victim, didn't recant like C.N. Okay? The first victim, she said everything up to the point of the actual sexual assault, and then she refused to answer the questions. We took a 15 ---- Refused to answer questions, or she said no? She said no, nothing else? She said no. Correct. She said it didn't happen. Then when I attempted to ---- It's a continuing problem with your answers. I'm sorry? You say one thing, and then I say it wasn't an accident, and you say something else. All right. Go ahead. I apologize. She said no. You are correct. She said no. And when I attempted to refresh her recollection with her prior statements, she denied even talking with Carly Monsher. She denied talking to Dr. Brown. She came back after the 16-minute break, I think is what the record said. She came back after the break, said that he had touched her private parts. First questions out of defense counsel's mouth were, first of all, you remember before the break, Ms. Sampson was asking you questions about knowing the difference between a truth and a lie. You remember that you promised to tell the truth, right? And you told us, or when you told us, that Mousey, that was the defendant in this case, his nickname, when you told us that Mousey didn't touch you, that was the truth, right? And she agreed with him. That leaves out there nothing but an implication that after the break, when she said that Mousey, the defendant, did in fact touch her, that that was a lie. He never, in fact, even to this day, has stated that there was a motive that predated their statements. And I suppose based on Mr. Kaplan's argument, what he's saying is that there was no motive. These were just stories. But stories are the same. The implication, again, is that it's a lie. So to ask her, right on the heels of her testimony, saying that Mousey had touched her private parts, that she promised to tell the truth, and that when she said that he didn't touch her, that she was telling the truth then, by implication, when she said he did touch her, she was not telling the truth. I don't think there's any clearer implication than that. And again, being that this is a rule of fairness and equity and completeness, it would be completely unfair and prejudicial to the government to leave that statement out there without allowing them to know the full story, which was that before, long before her testimony, she had actually said this happened.  So I'm going to stop there. I don't have time, so please wrap up. Thank you. The only thing I was going to say is that in terms of harmless error, Carly Monsher did testify on the record that both of these victims had at one time, even in their prior interviews, said it didn't happen and said that it didn't happen. So I don't believe that there's any error here. I would ask the Court to defer to the trial court's rulings and affirm the convictions. And I thank you. Very quickly, Your Honors. On page 157, Ms. Sampson first said she couldn't hear, and then two lines later, she did actually ask a follow-up question, minor point. Ms. Sampson has made an assertion about the significance of questioning practice during voir dire. It's true that in Miller L., the Court had a special case of looking at differential questioning of black and white jurors' attitude about the death penalty, but it's also true that in many cases, including the rest of Miller L., Ali, and many other cases from this Court, just the simple fact of not questioning at all is seen as highly significant. And the Supreme Court in Miller L. said, quote, "'The State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination, period. Nothing to do with whether it's differential.'" Is it your position that the government failed under Batson at stage 2 of the analysis? No, Your Honor. Our position is that they, at stage 3, the judge should have clearly erred in not finding discrimination in the strike. However, as Judge Berzon has pointed out, there is some basis even for questioning stage 2 when the proffered justification itself appears to reflect a racial motivation or bias in striking practice. Okay. Thank you very much. Thank both of you for your arguments. The case of United States v. Quesada is submitted. And we will go to the last case of the day, United States v. J.D.T. Juvenile Mail.
judges: Zouhary, Alarcon, Berzon